David A. Ericksen, Esq. (SBN 153923)
Joshua A. Cohen, Esq. (SBN 180293)
COLLINS + COLLINS LLP
2175 N California Boulevard, Suite 835
Walnut Creek, CA  94596
(510) 844-5100 – FAX (510) 844-5101
Email: dericksen@ccllp.law
Email: jcohen@ccllp.law

Attorneys for Plaintiffs
FIFTH CHURCH OF CHRIST, SCIENTIST, IN SAN FRANCISCO, CALIFORNIA,
FORGE DEVELOPMENT PARTNERS, LLC, and TL 450, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NORTHERN CALIFORNIA

| | |
|---|---|
| FIFTH CHURCH OF CHRIST, SCIENTIST, IN SAN FRANCISCO, CALIFORNIA, a California religious corporation, FORGE DEVELOPMENT PARTNERS LLC, a California limited liability company, TL 450, LLC, a California limited liability company, <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO, CITY AND COUNTY OF SAN FRANCISCO PLANNING COMMISSION, BOARD OF SUPERVISORS OF THE CITY AND COUNTY OF SAN FRANCISCO, and DOES 1-25, <br><br> Defendants. | Civ. No. 3:22-CV-01608 |

## <u>COMPLAINT</u>

Comes now FIFTH CHURCH OF CHRIST, SCIENTIST, IN SAN FRANCISCO,

CALIFORNIA, (Church), FORGE DEVELOPMENT PARTNERS LLC, and TL 450, LLC, by

and through their attorneys, and for their Complaint state as follows:

1

## NATURE OF ACTION

1.      This action is commenced by Plaintiffs to redress violations of their civil rights, as protected by the Free Exercise Clause of the United States Constitution, 42 U.S.C. § 1983, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. 2000cc, *et seq.* ("RLUIPA"), the  Fair Housing Act, 42 U.S.C. § 3604 ("FHA"), and takings of vested property rights granted by operation of  Housing Accountability Act ("HAA"), California Government Code section 65589.5, caused by the Defendants' unlawful conduct that prevented Plaintiffs from building a house of worship and housing development on the Church's property that would meet the Church's religious needs and provide much needed affordable and workforce housing in San Francisco.

2.      The Church cannot fulfill its religious mission in its current structure and seeks to replace its current building with a place of worship that will accommodate its religious exercise. The Church's building on a blighted street-front and alleyway that regularly attracts violence and drug use in front of the Church prevents it from offering a welcoming environment and blocks members' access to the Church.  Tent encampments adjacent to the building block access to the Church's entrances.  Garbage, human excrement, urine, used hypodermic needles and graffiti must be cleaned up by the Church daily.  Members and staff have been attacked, threatened and subjected to racist slurs.

3.      For years, the Church has sought to replace the current structure with a new house of worship, Christian Science Reading Room, and housing project that will animate the block and eliminate the blight that fosters unsafe and unwelcoming conditions for Church members.

4.      Plaintiffs also seek to construct affordable and workforce housing on its property that is desperately needed in the Tenderloin neighborhood and that will enable the Church to fulfill

2

its religious mission of serving its local community by providing safe and dignified housing, and bringing healing to the neighborhood.

5.      Despite applying for a new church building and housing project on its property that complies with all objective Planning Code requirements, Defendants have caused extreme and unreasonable delays in the land use approval process and ultimately voted to disapprove the Church's project in violation of state and local land use law.  Defendants' actions, which are not the least restrictive means of furthering a compelling governmental interest, prevent the Church from building a structure that meets its religious needs and substantially burden its free exercise of its religion.  The ongoing delays and ultimate disapproval of the project have also blocked the construction of new housing in the Tenderloin, including affordable housing, and is part of a larger attack on group housing in the City.  The denial of this project and subsequent actions taken to restrict group housing City-wide have a disproportionate impact on racial minorities and families with children, which is statistically significant and severe, and takes place amidst a housing crisis "of historic proportions."

6.      Plaintiffs seek declaratory and injunctive relief under RLUIPA, the FHA, the United States Constitution, and Housing Accountability Act for injuries suffered as a result of Defendants' unlawful conduct.  Plaintiffs also seek damages and attorney's fees and costs.

## JURISDICTION

7.      This Court has jurisdiction over all federal claims in the Complaint as arising under the United States Constitution and laws pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and (a)(4), and under 42 U.S.C. § 2000cc, *et seq.*, which confers original jurisdiction on United States District Courts in suits to redress the deprivation of rights, privileges and immunities, as stated herein.

This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202.

8.    This Court also has supplemental jurisdiction over Counts V through VIII under 28 U.S.C. § 1367(a) for claims brought under California law.

## DIVISIONAL ASSIGNMENT

9.    Venue lies in this District pursuant to 28 U.S.C. § 1391.  The Plaintiffs and Defendants are located in this District, and the property at issue is in the City of San Francisco. All events giving rise to this action occurred in this District, San Francisco County, thus the matter should be assigned to the San Francisco Division.

## PARTIES

10.    At all times herein mentioned Plaintiff FIFTH CHURCH OF CHRIST, SCIENTIST IN SAN FRANCISCO, CALIFORNIA (the "Church") was and is an incorporated church located in San Francisco, California and is a religious institution that has owned the real property located at 450 O'Farrell Street ("the Church Property") since the 1920s.

11.    At all times herein mentioned Plaintiff FORGE DEVELOPMENT PARTNERS LLC ("Forge") was and is a California limited liability company with its principal place of business in San Francisco, California and is the Church's developer and co-sponsor of the conditional use authorization application for the Church project.

12.    At all times herein mentioned Plaintiff TL 450, LLC ("TL 450") was and is a California limited liability company with its principal place of business in San Francisco, California.  Plaintiff TL 450 was formed by the Church and Forge to receive title to the Church Property, obtain financing, jointly develop the project, and is contractually obligated to build a new church facility on the Church Property.

4

13.     Defendant CITY AND COUNTY OF SAN FRANCISCO ("City") is a municipal corporation located in San Francisco, California, with an address of 1 Dr. Carlton B. Goodlett Place, San Francisco, California 94102.

14.     Defendant CITY AND COUNTY OF SAN FRANCISCO PLANNING COMMISSION ("Planning Commission") is a Planning Commission established pursuant to Section 4.105 of the San Francisco, California Municipal Code.

15.     Defendant SAN FRANCISCO BOARD OF SUPERVISORS ("Board") is a policy making, legislative, and quasi-judicial municipal body, with authority to hear appeals of certain housing development projects.

16.     Does 1-25 are individuals and entities who are not known at this time, but who have collaborated and conspired to deny Plaintiffs' rights have set forth herein.

## FACTUAL ALLEGATIONS

### Fifth Church of Christ, Scientist and Its Religious Exercise

17.     The Church is a Christian Science congregation located at 450 O'Farrell Street in San Francisco's Tenderloin district.

18.     The Church building currently located on the Church Property was built in the early 1920s.

19.     The Church has been an active presence in the Tenderloin for nearly a century.

20.     The Church believes that God's love is at the core of Christian Science, and that Christian Science is based on the idea that God loves all persons unconditionally and is the only true power and source of all good.

21.     The Church believes that one of the tenets of Christian Science is to "pray for that Mind to be in us which was also in Christ Jesus; to do unto others as we would have them do unto us; and to be merciful, just, and pure."

22.     The Church believes that it continues collectively the healing activities that Jesus carried out individually, and that humanity has never had a greater need for the Church to be able to fulfill its missionary calling than now.

23.     As part of its religious mission, the Church seeks to bring hope, comfort, compassion, healing and peace to individuals and to the community in which it is located.

24.     *Science and Health with Key to the Scriptures*, which was written by the founder of Christian Science, defines a church as:

> The structure of Truth and Love; whatever rests upon and proceeds from divine Principle. The Church is that institution, which affords proof of its utility and is found elevating the race, rousing the dormant understanding from material beliefs to the apprehension of spiritual ideas and the demonstration of divine Science, thereby casting out devils, or error, and healing the sick.

25.     The Church believes that a house of worship plays a larger role in society than merely a place for people to attend religious services.  It is a purveyor of hope, forgiveness, and love in everyday life.

26.     The Church believes that "[t]here must be congruity between faith and form. The new faith must make its own new forms. This requirement rests on every age." *Interpreter's Bible*.

27.     The Church's mission requires the Church to provide a friendly, welcoming environment for members of the local community to see the light of Christ and feel the friendly, welcoming love of the Church family.

28.     Essential to the Church's mission is that the Church building be inviting and easily accessible to the public.

29.     The Church believes that for the light of Christ to be easily seen, its building must be designed in an appealing way so that its light and love embraces the individual and exemplifies fully the words of the Master: "You are the world's light . . . Men do not light a lamp and put it under a bucket.  They put it on a lamp-stand and it gives light for everybody in the house.  Let your light shine like that in the sight of men.  Let them see the good things you do and praise your Father in Heaven."  (Matthew 5:14-16 J.B. Phillips.)

30.     It is the persistent resolve of the members of the Church to have a church edifice that complies with and typifies their religious tenets in today's society.

31.     The Church believes that stepping within its place of worship should awaken the individual to his own worth and to the fact that that he is precious to God and to his fellow man, whether a four-star General or an atheist, whether homeless or suffering from drug addiction, whether an engineer or a struggling family member trying to solve a vexing problem or seeking peace, comfort and a purpose for living.

32.     The San Francisco neighborhood known as the Tenderloin, in which the Church is located, has changed dramatically in the more than ninety years that the Church has been located on O'Farrell Street.

33.     Unlike in the 1920's when the Church was built, the Tenderloin is now infamous for violent crime and illegal drug activity.

34.     The Church is committed to remaining in its current location in the Tenderloin to serve the local community, which is central to its religious mission.

35.     However, the Church Property is currently a site for illegal drug activity and violence.

36.     Used hypodermic needles are regularly found around the Church Property and have been found inside the Church office from its mail slot.

37.     The window to the Church's Sunday school was penetrated by a bullet and glass scattered across the school tables and pews.

38.     Garbage, human excrement, and graffiti must be cleaned up by the Church daily, and sometimes several times a day.

39.     Members of the Church, including the caretaker, regularly face threats of violence.

40.     The Church's caretaker has been assaulted while cleaning the area in front of the church on multiple occasions.  He has been threatened with a knife, gun, metal pipe, and pit bull on separate occasions, and has been subjected to racial slurs.

41.     A Church member's car was attacked while she was in it.

42.     Despite assaults and attacks, the San Francisco Police Department has been largely unresponsive to calls for help and requests for protection.

43.     In a single week, members of the Church community called law enforcement and the San Francisco Homeless Outreach Team over fourteen times in response to dangerous situations, and received virtually no response from law enforcement.

44.     Law enforcement did not respond to reports of violence, drug dealing, or vandalism.

45.     Members of the Church community are afraid to go to the church under these conditions.

46.     The lamppost in front of the church has been vandalized repeatedly, the power line spliced and extension cords snaked around the sidewalk to homeless encampments against the church, creating a significant fire hazard.

47.     A homeless encampment in front of the Church caught fire and debris was blown all over the church entrance and building.

48.     The City did not respond to calls from the Church community about the power line splicing for over a week.

49.     There is frequent urination on and around the Church's building, and people often have to step over human feces to enter the building.

50.     Human excrement is also found on the walls and doors of the Church building.

51.     Urine seeps into the church building's walls and can be smelled in the interior of the building.

52.     Homeless encampments block access to the Church entrances.

53.     The Church doors, its handicap ramp, and its emergency exits have often been blocked, preventing members of the Church community from going into the facility.

54.     Access to the Bible verse sign in front of the Church is also frequently blocked, preventing the Church from changing the sign, which is a part of the Church's religious exercise and expression.

55.     The Church was forced to install a chain link fence in front of the Church's portico in an attempt to keep the excrement and illegal activity from the Church's front steps.

56.     Unsafe and unsanitary conditions are antithetical to the Church's critical mission of welcoming individuals seeking comfort and healing into the Church.

57.     The physical structure of the building is also not welcoming.

58.     Walls of concrete block and large stucco columns create dark corners that foster unsafe conditions.

59.     The monumental scale and solid concrete block exterior walls of the current building give an impression of coldness and exclusion, which is the antithesis of the Church's religious need to convey God's light and love through its structure and welcome those who seek peace and comfort.

60.     The front entrance of the building is inactive except on Sunday morning when there are Church services or when there are meetings.

61.     The current structure also creates barriers to mobility and access.

62.     The steps up to the Church's sanctuary are difficult for the elderly and individuals with disabilities, and there is no handicapped access for Sunday school students or teachers.

63.      These conditions gravely impede the Church's mission of providing a welcoming and healing refuge.

64.     The current building cannot be improved to meet the religious Church's needs.

65.     The Church cannot fulfill its religious mission in its current structure.

66.     The Church seeks to rebuild its house of worship in a way that will enable it to fulfill its religious mission.

67.     The Church strives to be an institution which affords proof of its utility by contributing to the spiritual and physical well-being of the community and to be a beacon of light in its community.

68.     The proposed church project, described below, would replace the current structure with a new church building, the design of which will be welcoming, light-filled and human-scaled to reflect the Church's spiritual mission of creating an atmosphere of light and warmth.

69.     Another aspect of the Church's religious mission is to provide healing to the community in which it is located through meaningful service.

10

70.     Another way that the Church seeks to serve the local community is by providing housing in the Tenderloin that low-income and working families can afford.

71.     The Church seeks to construct 316 units of affordable and workforce housing to enable working-class families and individuals to live in the city where they work.

72.     Adding 316 new housing units to the block would provide much needed animation and a constant flow of people to the area, eliminating blight and ending the use of the Church Property for illegal activity and restoring safety and dignity to the neighborhood.

73.     The Church believes that providing affordable and workforce housing in the Tenderloin will help the Tenderloin realize its potential of being a safe, beautiful, and stable neighborhood, and a neighborhood where people enjoy living, working and raising families.

74.     The Church also seeks to serve the community with a Christian Science Reading Room ("Reading Room").

75.     A Reading Room is a neighborhood sanctuary providing spiritual support and a safe haven where any individual can find hope, comfort, and healing.

76.     Christian Science Reading Rooms are open to the public daily throughout the week.

77.     For a Christian Science church, a Reading Room provides spiritual food to the community and offers healing and restoration.

78.     The Church's Bylaws require the Church to have a Reading Room.

79.     The Church's current building does not have a Reading Room.

80.     A Reading Room cannot be accommodated in the Church's current structure.

81.     The Church cannot fulfill its religious mission without a Reading Room.

11

82.     The proposed church will have a Reading Room, which will serve as a daily active presence in the neighborhood and provide a quiet place for study and prayer where anyone may learn of the teachings of Christian Science and its healing mission.

83.     The Church's central mission is healing in the broadest sense.

84.     Eliminating the unsanitary and unsafe conditions on the Church Property, providing a welcoming, healing refuge, and constructing housing that working class families can afford will benefit the local community and enable the Church to provide peace, comfort and solace to those who walk through its doors.

85.     The Church seeks to carry forward its healing mission that began over 90 years ago with a new church facility that will meet its religious needs.

86.     It is not possible for the Church to carry out its religious mission in its current building.

87.     It is critical for the Church to demolish the existing building and build a new one that will allow it to fulfill its religious mission.

<u>The Church's Land Use Application</u>

88.     Starting in the 1980s, the Church began meeting with City representatives to discuss replacing the current building with a new structure that would accommodate the Church's religious exercise.

89.     In or around 1984, the Church hired architect Richard Hannum, a licensed architect in the State of California, to design a new church building to replace the existing structure.

90.     In 2013, the Church began the formal application process for a new Church and housing development ("Project") by preparing a Preliminary Project Assessment ("PPA"), as required by the City's Planning Code.

91.     The Project would include a replacement church building on the Church Property and high-rise housing above the church.

92.     The replacement church building would be developed by combining the Church Property with two other properties located at 474 O'Farrell Street (the "474 Property") and 530 Jones Street (the "Jones Property") (the Church Property, 474 Property, and Jones Property are collectively referred to hereinafter as the "Properties").

93.     In November 2013, the PPA comments by the City Planners were mostly positive but noted the possibility of resistance from the "historic preservation crowd."

94.     In particular, comments by the Planning Department to the PPA included the statement "[T]his is the . . . best and most thorough presentation we have ever received in the PPA process," and

> Your project is fantastic and will be a real contribution to the city. It addresses all of the issues of the Tenderloin and the neighborhood and is sensitive to its location. Your issue is that we think the existing building is beautiful but we also see that the solution is a terrific design. The historic preservation crowd will rise up to save the building . . . but the mitigation will be made based on the design.

95.     Such praise gave the Church a reasonable expectation of being able to move forward with the Project.

96.     However, the Church's attempts to obtain necessary approvals for the Project were marked by substantial delays and obstacles from the beginning.

97.     No one from the Planning Department examined the Church's application for over six months.

98.     In addition to the City's delays, the Church faced opposition from those within the historic preservation community who opposed the Project on the basis that the building should be preserved for historic value.

99.     The Planning Department considered demolition of the existing church building to be an environmental impact due to its loss as a historic building, and indicated that an environmental study should focus solely on this issue.

100.    The Church initiated the environmental review process by preparing an Initial Study ("IS"), considering the environmental impacts of the Project.

101.    The IS took over a year to prepare due to delays by the City, even though there were no significant environmental factors to be studied other than the concern over historic preservation.

102.    Changes to the Planning Department staff reviewing the Project during this time caused further delays.

103.    On September 8, 2015, two years after filing its initial PPA, the Church and its developer, Thompson Dorfman LLC were finally able to submit a complete application for a conditional use permit ("CUP").

104.    The CUP application proposed demolition of three buildings: 450 O'Farrell Street, 474 O'Farrell Street, and 532 Jones Street.

105.    In early 2016, the City's Planning Department stated that it would not support a project that involved demolition of the existing Church because of historic preservation concerns, and compelled the Church to revise the proposed Project to incorporate portions of the existing building.

106.    The Planning Department and the Church ultimately agreed upon revisions for the Project that resulted in a costly concession by the Church in order to enable the Project to move forward.

107.    Even with a new design for the Project, the delays continued.

108.    New planners in the Planning Department were assigned to the Project while preservation alternatives were being considered, further slowing the process.

109.    The developer's architect was required to present preservation alternatives without direction from Planning Department staff.

110.    When preservation alternatives were presented to the staff by the Church's architect, no response or feedback was provided for months.

111.    Throughout this process, the Planning Department staff failed to provide timely review and comments to submissions prepared by the Church's consultants.

112.    Schedules for the review of the project were repeatedly revised to extend the environmental review time.

113.    In April 2017, the Church and its representatives met with the City's Planning Director and his staff to discuss why the project processing was being delayed.

114.    During the meeting, the Church learned that Planning Department staff were seeking a further revision to the design of the project.  Significantly, the requested revision had not been disclosed to the Project's architectural team or the Church.

115.    During this meeting, a new expedited schedule for the completion of the ongoing environmental review process was proposed and discussed, again focusing solely on the historic preservation concerns expressed by the City.

15

116.    After the meeting, a new schedule was presented to the Project's development team that was considerably different from the schedule discussed at the meeting.

117.    Despite assurances by the Planning Department of a more timely process, delays continued.

<u>The City Requires an Environmental Impact Report Based<br>Solely on Historical Preservation Concerns.</u>

118.    Although the Church completed the initial environmental report through the IS, the Planning Department determined that a full Environmental Impact Report ("EIR") was required, again, based solely on historical preservation concerns.

119.    To complete the EIR, the developer hired its own historic preservation architect to advise the development team on the historic preservation issues and to assist in the development of an appropriate design for the Project.

120.    On October 25, 2017, the Planning Department published the draft EIR for public review, which was available for public comment until December 11, 2017.

121.    During this time, the Church, together with the San Francisco Interfaith Council, met with the Mayor's Office to obtain support for its proposal to demolish the building.  Following the meeting, the more favorable, expedited schedule from the April meeting with the Planning Department was re-established.

122.    On November 30, 2017, the Planning Commission conducted a public hearing to solicit comments regarding the EIR.

123.    On February 1, 2018, the Planning Department requested that the Church consider a new partial preservation alternative to demolition, but the Church was never informed as to what such proposed alternative should be.

124.    The Planning Commission's hearing on the CUP and the EIR was finally held on September 13, 2018, and the EIR and CUP application were approved.  The City issued a Conditional Use Authorization ("CUA") granting the CUP and outlining the terms and conditions of the permit, and adopting the California Environmental Quality Act ("CEQA") findings.

125.    It had taken five years for the Church to obtain a hearing before the Planning Commission because the City had stalled, delayed, and was adamant that they would not approve the Project without certain unworkable conditions, one of them being that the new building preserve the original building's facade.

126.    After a painstaking, lengthy and costly process of revising their plans based on the City's directives to preserve the facade, Plaintiffs were told that preserving the facade was "facadism" and that they would not be required to preserve the original facade.

127.    Despite costly revisions to the plans and corresponding delays, the project was ultimately approved without any requirement to preserve the original facade.

### Appeal of the Conditional Use Approval by Local Group

128.    In November 2018, the San Francisco Heritage Group ("Heritage") appealed the issuance of the CUP to the City's Board of Supervisors raising concerns over historical preservation.

129.    Heritage's appeal caused further delay in the Church's efforts to move forward with the Project.  The City's appeal process and its emphasis on the historical preservation issues during the environmental review process contributed to this delay.

130.    The Heritage Group's appeal was eventually withdrawn or rejected and the Church's CUP application was approved on November 13, 2018.

131.    Thereafter, the City' Planning Department further unreasonably delayed the Project by failing to set the applicable standards and hold hearings as required to approve the Project until October 2019.

132.    Due to additional unnecessary and extreme delays, the City did not issue a Site Permit until May 13, 2020.

<u>Developer Withdraws Due to Financial Impact of City's Delays<br>and Project is Revised</u>

133.    Due to the financial impacts of the City's years-long delays in processing the Church's application, the Project became unfinanceable.  As a result, Project developer Thompson Dorfman LLC withdrew from the Project in October of 2019.

134.    Thompson Dorfman's withdrawal was a direct result of the City's delays.

135.    The withdrawal was an extreme hardship for the Church, deprived the Church of critical financing needed to proceed and resulted in substantial financial harm to Plaintiffs.

136.    Because the project was no longer financeable, a revised project plan was necessary.

137.     Richard Hannum and Forge resumed development efforts on behalf of the Church, and developed a revised project plan ("Revised Project") that would be financeable and allow the Church to fulfill its religious mission.

138.    The Revised Project included a new church and more affordable and workforce housing than the previous version, which would benefit the local population and enable the Church to fulfill its mission of providing the community with much needed housing that working families could afford.

139.    The original plan included 28 units of Below Market Rate affordable housing, whereas the new plan includes 48 units of Below Market Rate ("BMR") affordable housing.

18

140.    The original plan included 148 market rate dwelling units, whereas the new plan includes 316 group housing units as defined in the San Francisco Planning Code, 48 of which are BMR.

141.    Forge previously worked with IBM, Panasonic and others in an ideation process that generated a new concept for housing that utilizes technology and innovation to maximize space and livability, which is the basis for Plaintiffs' plan amendment.

142.    Every unit in the new plan has cooking facilities sufficient to cook full meals, including refrigerators, cooktops, multi-phase convection ovens, dishwashers, sinks, garbage disposals, and food storage space.

143.    Every unit has full bathrooms.

144.    Units in the back of the building have balconies.

145.    The building additionally includes shared community environments, including state of the art community kitchen and dinner party spaces, outdoor green spaces including two courtyards and rooftop gardens, and rooftop bar-b-ques.

146.     The Revised Project includes housing units suitable for families with children, including two- and three-bedroom units, as well as added amenities that are desirable for families with children.

147.    The building would have Resident Support Services provided by Project Access which would include programs such as after-school activities for children and personal financial management.

148.    The amenities in the building would likely attract families with children.

149.    The Revised Project provides high-quality, safe and dignified housing in the Tenderloin, which is part of the Church's religious mission. The Church's project mission statement states

> Our community urgently needs attractive, well-designed housing that working families can afford. Therefore, our church is sponsoring the building of rental housing on our property. We feel this project will help the Tenderloin realize its potential of being a safe, beautiful, and stable neighborhood - a neighborhood where people enjoy living, working and raising families.

150.    The new plan enables the Church to fulfill its religious mission.

<u>Applicable Land Use Regulations</u>

151.    As provided for in the San Francisco Planning Code ("Code"), the Properties are located in the "Residential Commercial 4" (RC-4) zoning district.

152.    Under the Code, group housing is permitted as a principal use in the RC-4 zoning district.

153.    As a principal use in the RC-4 zoning district, group housing is *not* subject to a conditional use standard or review requirements.

154.    Under Section 209.3 of the Code, group housing is permitted at a density of up to one bedroom per every 70 square feet of lot area.

155.    The Housing Accountability Act ("HAA"), Government Code Section 65589.5, applies to local governments in California.

156.    The HAA, Government Code Section 65589.5, states:

> (j) (1) When a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete, but the local agency proposes to disapprove the project or to impose a condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon written findings supported by

a preponderance of the evidence on the record that both of the following conditions exist:

(A) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density. As used in this paragraph, a "specific, adverse impact" means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete.

(B) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to paragraph (1), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density.

157.   Under Government Code Section 65589.5(a)(2)(L), "[i]t is the policy of the state that this section be interpreted and implemented in a manner to afford the fullest possible weight to the interest of, and the approval and provision of, housing."

158.   Under Government Code Section 65589.5(a)(3), "[i]t is the intent of the Legislature that the conditions that would have a specific, adverse impact upon the public health and safety, as described in paragraph (2) of subdivision (d) and paragraph (1) of subdivision (j), arise infrequently."

159.   Under Government Code Section 65589.5(b), "[i]t is the policy of the state that a local government not reject or make infeasible housing development projects . . . that contribute to meeting the need determined pursuant to this article without a thorough analysis of the economic, social, and environmental effects of the action."

160.   The California Department of Housing and Community Development issued the Housing Accountability Act Technical Assistance Advisory ("Advisory") on September 15, 2020.

161.   According to the Advisory, the HAA

establishes limitations to a local government's ability to deny, reduce the density of, or make infeasible housing development projects. . . that are consistent with objective local development standards and contribute to meeting housing need. The Legislature first enacted the HAA in 1982 and recently amended the HAA to expand and strengthen its provisions as part of the overall recognition of the critically low volumes of housing stock in California. In amending the HAA, the Legislature made repeated findings that the lack of housing and the lack of affordable housing, is a critical problem that threatens the economic, environmental, and social quality of life in California.

162.   According to the Advisory, the HAA

establishes the state's overarching policy that a local government may not deny, reduce the density of, or make infeasible housing development projects. . . that are consistent with objective local development standards. Before doing any of those things, local governments must make specified written findings based upon a preponderance of the evidence that a specific, adverse health or safety impact exists. Legislative intent language indicates that the conditions that would give rise to such a specific, adverse impact upon the public health and safety would occur infrequently.

. . . .

The HAA was originally enacted in 1982 to address local opposition to growth and change. Communities resisted new housing, especially affordable housing, and, consequently, multiple levels of discretionary review often prevented or delayed development. As a result, developers had difficulty ascertaining the type, quantity, and location where development would be approved. The HAA was intended to overcome the lack of certainty developers experienced by limiting local governments' ability to deny, make infeasible, or reduce the density of housing development projects.

Recognizing that the HAA was falling short of its intended goal, in 2017, 2018, and again in 2019, the Legislature amended the HAA no less than seven times to expand and strengthen its provisions. Key restrictions on local governments' ability to take action against housing development projects are set out in Government Code section 65589.5, subdivisions (d) and (j).  The law was amended by Chapter 368 Statutes of 2017 (Senate Bill 167), Chapter 373 Statutes of 2017 (Assembly Bill 678) and Chapter 378 Statutes of 2017 (Assembly Bill 1515), as part of the California 2017 Housing Package. The law was further amended by Chapter 243, Statutes of 2018 (Assembly Bill 3194) and Chapter 654, Statutes of 2019 (Senate Bill 330).

163.    According to the Advisory, the legislative intent of the HAA

was to limit local governments' ability to deny, make infeasible, or reduce the density of housing development projects. After determining that implementation of the HAA was not meeting the intent of the statute, the Legislature has amended the HAA to expand its provisions, strengthening the law to meaningfully and effectively curb the capacity of local governments to deny, reduce the density or render housing development projects infeasible.

Application to Amend Conditions of Approval

164.    On January 24, 2020, Plaintiff Forge filed an application with the Planning Department to amend the Conditions of Approval Numbers 24, 25, 26 and 32 (the "Amendment") of the previous approval for the Revised Project that would replace the approved dwelling units with over 300 group housing units and increase the number of affordable and workforce housing units in the project.

165.     Conditions of Approval Numbers 24, 25, 26 and 32 were related to Parking for Affordable Units (#24), Car Share (#25), Bicycle Parking (#26), and the Inclusionary Affordable Housing Program (#32).

166.    The revisions to the Project were all within the envelope of the previously approved CUP.

167.    The modifications impacted none of the prior approvals.

168.    The only substantive change requiring new approval was the change from dwelling units to group housing.

169.    The Revised Project, with 316 bedrooms on a 22,106 square foot site, is compliant with the group housing requirements in the Code.

170.    Group housing is a permitted use in the RC-4 zoning district and the Revised Project is consistent with the standards for group housing in the RC-4 zone.

Special Interests Groups Challenge the New Plans and Delays Continue

171.    A meeting for the Planning Commission to vote on the Amendment to the CUP was scheduled for January 7, 2021.

172.    In December of 2020, just weeks before the scheduled Planning Commission hearing, two local groups, the Tenderloin Housing Clinic ("THC") and the Tenderloin Neighborhood Development Corporation ("TNDC"), sent letters to the Planning Commissioners voicing strong opposition to the Church's proposed development.

173.    Richard Hannum of Forge promptly contacted the executive directors of the THC and TNDC to arrange a meeting before the January 7, 2021 scheduled hearing date.  Mr. Hannum received no response, and despite repeated efforts, Plaintiffs were unable to arrange a meeting with these organizations until March 23, 2021.

174.    The THC and TNDC objected to the Revised Project on the basis that Plaintiffs did not consult with them first before amending the CUP to increase the number of units in the proposed development, even though Plaintiffs had no obligation to do so and did engage in extensive community outreach.

175.    The THC and TNDC also objected to Plaintiffs' plans to develop much needed affordable housing in the Tenderloin claiming that the proposed units do not meet the needs of families with children.  In reality, both organizations are the largest developers of Single Room Occupancy ("SRO") units in the Tenderloin, which generally do not accommodate families with children.

176.    Upon information and belief, the THC currently leases and manages 23 SROs (over 1,800 units) for single adults, and owns and manages the Galvin Apartments at 785 Brannan Street.

177.    Plaintiffs seek to serve the diversity of types of families that actually live in the Tenderloin, which includes a large number of single-parent families.

178.    In response to the "concerns" expressed by THC and TNDC, Forge again revised the plans to include larger rooms.  These revisions to the plans are all within the envelope of the approved project and consistent with all relevant objective standards.

179.    As a result of the opposition by THC and TDNC, the January 7, 2021 hearing did not take place, and was continued seven times before a vote was taken.

180.    The hearing dates which were continued include January 7, 2021, January 21, 2021, February 4, 2021, March 11, 2021, April 1, 2021, April 15, 2021 and June 10, 2021.

181.    Neither the staff nor the Commission provided legitimate reasons to delay the hearings.

182.    These continuances caused financial harm to Plaintiffs as they continued to bear the carrying costs and expenses associated with the Project.

183.    The Planning Commission received approximately 54 letters in support, including letters from YIMBY Law and Project Access.  The San Francisco Housing Action Coalition submitted a petition in support with forty-two signatures.

184.    The support for the Revised Project is based on the development of new, affordable and workforce housing in the Tenderloin, benefits to the community and a new Church facility that will meet the needs of the Church.

185.    The Planning Commission received approximately five letters in opposition by competing neighborhood development groups.

186.    Although a hearing was finally held on April 15, 2021, in which the Project Sponsor gave a presentation on the Project, no vote was taken.

187.    A continued hearing took place on June 10, 2021, in which the Commissioners made recommendations, but still no vote was taken.

188.    In response to the input from the community and recommendations by the Planning Commission, the Project Sponsor made significant revisions to the project plans, including:

A.    Increasing larger-unit count;

B.    Adding two additional community kitchens and large dinner party spaces for residents;

C.    Adding improvements to amenity spaces and greenspace courtyards;

D.    Adding balconies;

E.    Increasing bicycle storage beyond code requirements; and

F.    Assessing the feasibility of converting ground level retail space into group housing units.

189.    At the June 24, 2021 hearing, the Planning Commission voted to approve the Revised Project, finding that it complies with Planning Code requirements.

190.    The Commission concurred with the Planning Department's conclusion in the December 21, 2020 addendum to the Final EIR that no further environmental review is required for the Revised Project.

191.    Despite the absence of any modifications that would have an environmental impact on the project and despite the EIR addendum from December 21, 2020, which concluded that the modifications caused no significant new environmental impacts and that no further environmental review is required, the City prepared a second addendum to the EIR requiring the Church to pay an additional Addendum fee of approximately $30,000.

26

Appeal to the Board of Supervisors

192.     On July 21, 2021, the THC, one of the largest operators of SRO units in the Tenderloin, and the Pacific Bay Inn Hotel ("PBI") located adjacent to the Church Property, appealed the Planning Commission's approval to the Board of Supervisors ("Board").

193.     The majority of PBI's appeal centered on Appellants' claim that construction impacts would negatively impact neighboring PBI and that the environmental analysis did not sufficiently address potential structural and construction impacts.

194.     The issue of construction impacts was not before the Planning Commission and the time to appeal the environmental analysis had expired.

195.     There is no requirement that construction impacts be addressed at CUA stage, but instead must be resolved before a building permit is issued.

196.     Ultimately, the Project Sponsor and PBI reached an agreement on potential impacts to PBI, and as a result, PBI withdrew its appeal before the appeal was decided.

197.     With the withdrawal of PBI's appeal, the only remaining bases for the appeal were Appellant THC's claims that there was a "lack of community outreach" and "the Project is not compatible with the Tenderloin."

198.     "Community outreach" is not a requirement for Conditional Use Approval under Section 303(c) of the San Francisco Planning Code ("Planning Code").  Nevertheless, the Project Sponsor engaged in extensive community outreach efforts.  The Project Sponsor held *48* stakeholder meetings, *3* canvassing events, and *4* community meetings, as well as placing over *300* calls and emails to stakeholders between November of 2020 and late July of 2021.

199.    Appellant's other remaining argument was that "the Project is not compatible with the Tenderloin," "out of place," and "undesirable," and that Appellant had concerns about developing this project "in one of the densest neighborhoods in the City."

200.    The block on which the Revised Project would be built is deserted and blighted, and as a result, is a site for homeless encampments, drug use and violent crime, which blocks access to the Church for its members.

201.    A new church, affordable and workforce housing that could accommodate essential workers and families, and a Christian Science Reading Room open to the community is "not out of place" or "undesirable" in this neighborhood, but desperately needed.

202.    On August 30, 2021, the Planning Department submitted a memorandum ("Planning Commission Memorandum") to the Board regarding the appeal, which stated that the Commission finds that the Revised Project is consistent with the relevant provisions of the Planning Code, and that the Planning Department recommends that the Board uphold the Planning Commission's decision in approving the Project.

203.    The Planning Commission Memorandum indicated that the Revised Project is necessary and desirable for the City.

204.    The Planning Commission Memorandum indicated that the Project Sponsor engaged in community outreach.

205.    A hearing on the appeal took place before the Board of Supervisors on September 28, 2021 after additional delays.

206.    In the wake of PBI's withdrawal, the remaining Appellant, THC, raised new issues at the hearing that were not part of the Appeal and were not before the Planning Commission.

207.    Appellant's new "concerns," which were not included in its filed appeal and were articulated for the first time at the hearing, included the Project's BMR percentage, which is legally compliant, and the definition of group housing, which is a permitted use in this zoning district.

208.    The Board focused its discussions on the new issues such as BMR requirements and the definition of group housing, which were outside of the scope of the appeal.

209.    At the September 28, 2021 hearing, Appellant, who is not a church member and does not attend services at the Church, gave testimony related to the Church's religious exercise. After the Church Board President testified about the burdens imposed on the Church's religious exercise in the current structure, Appellant testified that the Church "can still practice in the existing space.  They are basically talking about the outside. . . . so they can still practice at the existing church."

210.    Supervisor Matt Haney also commented on the Church's religious exercise.  After the Church Board President testified about the conditions in front of the Church which have endangered its members and staff, blocked access to the Church, and interfered with its religious exercise, the Supervisor stated "I also want to say that some of the ways that the description of the neighborhood and the residents in the tenderloin--I think if you truly want to be a church of compassion and healing, you might want to think about how people experience those words."

211.    Supervisor Haney also told this Christian Scientist Church that the Church should "think about the way you can build true partnerships of love and respect with everyone in the neighborhood."

212.    Supervisor Haney added

"I think that if you all end up --- and you will I think in some way continue to be a resident church of this neighborhood. I hope that you fulfill that commitment of partnership and healing and compassion for everyone in our

> community including the people who may be on your block who need your
> help and our help as well."

Supervisor Haney did not acknowledge that the Church regularly calls various City agencies seeking help for residents in need and has been widely ignored by the City.

213.    No vote was taken at the September 28, 2021 hearing, as the Board voted to continue the hearing to October 5, 2021.

214.    At the October 5, 2021 hearing, the Board introduced new documents and arguments into the record after public comment had closed, and Plaintiffs were given no notice or opportunity to respond.  The Board failed to proceed in a manner required by law by allowing new arguments into the record and not giving Plaintiffs an opportunity to respond, denying Plaintiffs their right to a fair trial under CCP 1094.5.

215.    One of the documents introduced at the October 5, 2022 meeting was a Planning Department report, titled Housing for Families with Children ("Report").  Despite the Supervisor's mischaracterization of the Revised Project, the Revised Project comports with key parameters identified in the Report such as units large enough for families and onsite programs for children.

216.    At the September 28, 2021 and October 5, 2021 hearings, the Board displayed hostility to group housing, making statements about a "glut of group housing," questioning the definition of "group housing," and criticizing the Zoning Administrator's interpretation of group housing.

217.    At the October 5, 2021 meeting, the Board voted to grant the appeal and disapprove the Revised Project, but made the disapproval expressly "subject to the adoption of written findings by the Board in support of this determination."

218.     In disapproving the Revised Project with 316 units of group housing including 48 BMR units, the Board upheld the old project with 176 units of luxury housing and only 28 BMR units, which is not financeable in the current market and cannot be built.

219.     The disapproval was based on the Project's classification as a group housing development.

220.     Group housing is a permitted use in the RC-4 district, and does not require Planning Commission or Board approval in order to establish a new group housing use.  The question of whether or not to allow group housing was not part of the appeal, and was not part of the underlying decision of the Planning Commission that was being appealed, and was not an appropriate basis on which to disapprove the Project.

221.     The Board applied an unprecedented and unlawful standard to disprove the project, applying a conditional use standard to group housing, which is a principally permitted use, not subject to a conditional use standard.

222.     The disapproval of the Revised Project is part of a larger attack on group housing citywide.

223.     On November 22, 2021, the California Department of Housing and Community Development ("HCD") issued a letter ("Letter") to the City Planning Division expressing concern that "the City/County's actions are indicative of review processes that may be constraining the provision of housing in San Francisco" and violating state housing laws.

224.     Further, the Letter identified several indicators that the Board was violating state law, and indicated that the Board failed to decide the appeal in a timely manner even before the lengthy delay in issuing a written basis for its decision. The Letter is attached hereto as Exhibit A.

225.     On December 14, 2021, the Board issued a motion adopting written findings of the Board's disapproval of the Planning Commission's decision which stated in part: "For the reasons stated above, the Project would fail to serve the community, is not necessary and desirable for and is not compatible with the existing neighborhood and community; now, therefor, be it MOVED, That based on the foregoing findings and the entire record in Board File No. 210858, the Board of Supervisors disapproved the decision of the Planning Commission by its Motion No. M21-138 and denied issuance of the Conditional Use Authorization."  Thus, the action of the Board at issue was not complete until December 14, 2021.  The written statement of findings is referred to hereinafter as the "Findings."

226.     Under the HAA, Government Code Section 65589.5(j)(1)(A), the only basis on which the Board could disapprove of the Revised Project would be upon a finding that the Revised Project would cause a specific, adverse impact upon the public health or safety, which is defined by the HAA as a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions.

227.     The Board did not find that the Revised Project would have "a specific, adverse impact upon the public health or safety" nor did the Board identify any objective, identified written public health or safety standards, policies, or conditions that the Project failed to meet.

228.     Instead, the Board concluded that the Revised Project "would fail to serve the community, is not necessary and desirable for and is not compatible with the existing neighborhood and community," which is not the correct standard for disapproving this Project.

229.     The Board made the speculative statements in the Findings including that "residents of the Project would likely rely heavily on food delivery services, creating more congestion from food delivery vehicles (*e.g.*, GrubHub, DoorDash deliveries), leading to more pedestrian/vehicle

collision and increased pollution," which is not based on any evidence in the record and is not an appropriate basis on which to deny the Project. Other statements in the Findings were inaccurate, speculative and unsupported. Some of the statements therein were not raised by Appellants at the hearings or in the appeal filed, and Plaintiffs had no opportunity to address those new bases as stated in the Findings.

230.   Just weeks after the Board voted conditionally to deny the Project, on October 26, 2021, the Board voted to block another large housing project with affordable units on 469 Stevenson Street in San Francisco ("Stevenson Project").

231.   The Stevenson Project is a proposed mixed-use 27-story high rise with 495 housing units including approximately 89 affordable units. All of the units in the Stevenson Project have full kitchens and a large percentage have 2 or more bedrooms.

232.   On December 30, 2021, Yes In My Backyard ("YIMBY"), a California nonprofit corporation, filed a Petition for Writ of Mandate and Complaint for Declaratory Relief in the Superior Court of the State of California ("YIMBY Complaint") against the City and County of San Francisco based on the Board's disapproval of the Project, for their "unlawful disapproval of a 316-unit housing development project in San Francisco – on blatantly pretextual, prohibited, and unsupported grounds," and for the disapproval of the Stevenson Project.

233.   As stated in the YIMBY Complaint in part:

A.   The Board's action clearly violates state housing law. The findings did not identify any applicable, objective general plan and zoning standards and criteria that the Project failed to meet. Rather, the Board disapproved the Project based on vague, subjective, and prohibited "neighborhood compatibility" grounds.

B.   The Board did not identify any applicable objective, identified written public health or safety standards, policies, or conditions at all, nor did the Board find that the Project failed to meet any such health and safety standards.

33

C.      The Board did not identify any significant, quantifiable, direct, and unavoidable health and safety impacts, apart from speculation that future tenants would "likely" order food delivery that could lead to traffic accidents

234.    The Board's decision makes over 300 housing units unavailable in San Francisco.

235.    California currently has a housing crisis "of historic proportions."  Government Code Section 65589.5(a)(2)(A).

236.     "The consequences of failing to effectively and aggressively confront this crisis are hurting millions of Californians, robbing future generations of the chance to call California home, stifling economic opportunities for workers and businesses, worsening poverty and homelessness, and undermining the state's environmental and climate objectives."  Government Code Section 65589.5(a)(2)(A).

237.    The State of California Department of Housing and Community Development, Housing Accountability Act Technical Assistance Advisory states

California's housing supply has not kept up with population and job growth, and the affordability crisis has grown significantly due to an undersupply of housing, which compounds inequality and limits economic and social mobility. Housing is a fundamental component of a healthy, equitable community. Lack of adequate housing hurts millions of Californians, stifles economic opportunities for workers and businesses, worsens poverty and homelessness, and undermines the state's environmental and climate goals and compounds the racial equity gaps faced by many communities across the state.

238.    California Government Code § 65589.5 states

(a) (1) The Legislature finds and declares all of the following:

(A) The lack of housing, including emergency shelters, is a critical problem that threatens the economic, environmental, and social quality of life in California.

(B) California housing has become the most expensive in the nation. The excessive cost of the state's housing supply is partially caused by activities and policies of many local governments that limit the approval of housing,

increase the cost of land for housing, and require that high fees and exactions be paid by producers of housing.

(C) Among the consequences of those actions are discrimination against low-income and minority households, lack of housing to support employment growth, imbalance in jobs and housing, reduced mobility, urban sprawl, excessive commuting, and air quality deterioration.

(D) Many local governments do not give adequate attention to the economic, environmental, and social costs of decisions that result in disapproval of housing development projects, reduction in density of housing projects, and excessive standards for housing development projects.

(2) In enacting the amendments made to this section by the act adding this paragraph, the Legislature further finds and declares the following:

. . . .

(C) The crisis has grown so acute in California that supply, demand, and affordability fundamentals are characterized in the negative: underserved demands, constrained supply, and protracted unaffordability.

(D) According to reports and data, California has accumulated an unmet housing backlog of nearly 2,000,000 units and must provide for at least 180,000 new units annually to keep pace with growth through 2025.

. . . .

(F) Lack of supply and rising costs are compounding inequality and limiting advancement opportunities for many Californians.

. . . .

(J) California's housing picture has reached a crisis of historic proportions despite the fact that, for decades, the Legislature has enacted numerous statutes intended to significantly increase the approval, development, and affordability of housing for all income levels, including this section.

(K) The Legislature's intent in enacting this section in 1982 and in expanding its provisions since then was to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters. That intent has not been fulfilled.

239.   The City's actions have contributed significantly to the housing crisis in California.

Continued Efforts to Severely Limit Group Housing in the City

240.    After the denial of the Revised Project, the citywide attack on group housing continued.

241.    On December 14, 2021, the same day that the Board voted to adopt Findings in support of its disapproval of the Project, Supervisor Aaron Peskin introduced two ordinances that would dramatically limit group housing in the City: one proposed to eliminate kitchen facilities from Group Housing units (File No. 211299), and the other proposed to entirely eliminate group housing as a permitted use in the Tenderloin and in the City's Chinatown neighborhood (File No. 211300).

242.    Less than one month later, without the benefit of any public review or discussion of the issues surrounding group housing, the Planning Commission was asked to promote, and adopt such regulations.

243.    Group Housing has been growing in popularity over the last several years.

244.    Group Housing units are more affordable by design than many other housing types and can provide a wide range of amenities to residents at naturally lower rents.

245.    The City's sustained efforts to reduce the stock of group housing in the City, especially in the Tenderloin, will disproportionately and significantly reduce access to housing in San Francisco for African American households relative to White households.

246.    African Americans are greatly overrepresented in group housing compared with their representation in the City of San Francisco.

247.    African Americans comprise approximately 23% of the households living in group quarters, but comprise only 5.8% of the total population of San Francisco.  The representation of

African Americans in group quarters is approximately 400% larger than their representation in the City as a whole.

248.    Whites, in contrast, are underrepresented in group quarters.  The representation of Whites in group quarters is approximately 20% lower than their representation in the City as a whole.

249.     The City's attempts to prevent group housing from being built specifically in the Tenderloin will also disproportionately impact African Americans.

250.    The representation of African Americans in the Tenderloin relative to the City as a whole is also disproportionately high, with the representation of African Americans in the Tenderloin being 88% higher than their representation in the City as a whole.

251.    The City's actions to block group housing in the City disproportionately and adversely impacts African Americans.

252.    The City's actions to limit group housing also disproportionately and adversely impacts families with children.

253.    Supervisor Haney stated at the October 5, 2021 hearing, "[t]he Tenderloin has seen an increase in the number of young families of diverse backgrounds moving here. Many of them coming here as refugees or immigrants from around the globe.  The Tenderloin is currently the neighborhood with the densest concentration of children and families in the city."  (Emphasis added.)

254.    Supervisor Peskin stated at the October 5, 2021 hearing "[t]he ability for group housing residents especially families to have functional and adequate, as I said earlier, food storage, preparation, cooking facilities is absolutely essential. In fact, this board of supervisors

recently closed a loophole in our housing code to protect group housing from kitchen demolition and removal given how essential it is."

255.     Testimony at the February 10, 2022 Planning Commission hearing on the proposed ordinances to reduce and eliminate group housing overwhelmingly focused on the high demand for housing that can accommodate families in the City.

256.     The current definition of group housing allows for units with cooking facilities that can accommodate families with children.

257.     Every group housing unit in the Revised Project contained cooking facilities that would enable families to cook full meals, including refrigerators, cooktops, multi-phase convection ovens, dishwashers, sinks, garbage disposals, and food storage space.

258.     Group housing units with cooking facilities, which are less expensive than other housing types in the City, could accommodate families, including single-parent families who would not otherwise be able to afford to live in the City.

259.     Eliminating kitchen facilities from group housing units, as stated in the proposed ordinance, would prevent families from occupying this housing type, and would reduce the stock of housing that families with children could occupy, disproportionately impacting families with children.

260.     Defendants' policy of blocking, reducing and eliminating group housing has a significant, adverse, and disproportionate effect on a racial minorities and families with children.

261.     Defendants' policy of blocking, reducing and eliminating group housing caused the denial of the Project.

262.     The Board's disapproval of the Revised Project has caused substantial damages to Plaintiffs.

263.    Defendants possess no compelling interest in preventing the Project.

264.    The Board's disapproval of the Revised Project was not the least restrictive means of achieving any governmental interest.

265.    Based on the discretionary, arbitrary, and capricious judgment of the Board, the City has now made it impossible for the Church to build a new place of worship which would enable it to engage in its religious exercise as it believes it must.

266.    The substantial burden imposed upon the Church affects commerce among the several States.

267.    The construction of Plaintiffs' proposed project, at an estimated cost of approximately $170 million, would affect interstate commerce. The construction's effect on interstate commerce would result from, amongst other things, the transfer of funds to those it engages to construct the project; the engagement of construction companies to construct the project; the employment of and payments to construction workers either by Plaintiffs or by companies engaged by it; the purchase of necessary materials to construct the project; the use of interstate highways for the transportation of persons and materials used to construct the project; the use of interstate communication related to the construction of the project; and other activities related to the construction of the project.

268.    The Defendants' actions described above all took place under color of state law.

269.    The harm to the Church caused by the Defendants' laws and actions, which prevent the Church from using the Church Property to accommodate its religious needs, is immediate and severe.

270.    The Church has been unable to carry out its religious mission and to freely exercise its religion because of Defendants' actions.

271.     Defendants' laws and actions have burdened and continue to burden the Church's free exercise of religion.

272.     Defendants' entire course of conduct with respect to the Plaintiffs since the inception of the Project has caused substantial expense, delay, and uncertainty.

273.     Plaintiffs have also suffered significant financial damages as a result of the Defendants' actions. These include attorney's fees and professional fees.

274.     Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' wrongful laws and actions.

## COUNT I

**Violation of the Religious Land Use and Institutionalized Persons Act of 2000**
**"Substantial Burden on Religious Exercise"**
**(42 U.S.C. § 2000cc(a))**

275.     Paragraphs 1 through 274 are incorporated by reference as if set forth fully herein.

276.     Defendants have deprived and continue to deprive the Church of its right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing land use regulations in a manner that places a substantial burden on the Church's religious exercise without a compelling governmental interest, and without using the least restrictive means of achieving any such interest.

## COUNT II

**Violation of the United States Constitution**
**Free Exercise of Religion: First Amendment**
**(42 U.S.C. § 1983)**

277.     Paragraphs 1 through 276 are incorporated by reference as if set forth fully herein.

40

278.    Defendants have deprived and continue to deprive the Church of its free exercise of religion, as secured by the First Amendment to the United States Constitution, by burdening its religious exercise without using the least restrictive means of fulfilling a compelling governmental interest.

### COUNT III

**Fair Housing Act**
**Disparate Impact – Racial Discrimination**
**42 U.S.C. § 3604**

279.    Paragraphs 1 through 278 are incorporated by reference as if set forth fully herein.

280.    Defendants' actions have made and continue to make housing unavailable to racial minorities including African Americans in violation of the Fair Housing Act, 42 U.S.C. § 3604.

281.    Defendants' actions had and continue to have a significantly adverse and disproportionate impact on racial minorities including African Americans in violation of the Fair Housing Act, 42 U.S.C. § 3604.

### COUNT IV

**Fair Housing Act**
**Disparate Impact – Familial Status**
**42 U.S.C. § 3604**

282.    Paragraphs 1 through 281 are incorporated by reference as if set forth fully herein.

283.    Defendants' actions have made and continue to make housing unavailable to families with children, in violation of the Fair Housing Act, 42 U.S.C. § 3604.

284.    Defendants' actions had and continue to have a significantly adverse and disproportionate impact on families with children, in violation of the Fair Housing Act, 42 U.S.C. § 3604.

41

## COUNT V

**Writ of Mandate - Violation of California Housing Accountability Act
(Gov't Code § 65589.5, *et. seq.*)**

285.    Paragraphs 1 through 284 are incorporated by reference as if set forth fully herein.

286.    Plaintiffs assert that the disapproval of the Project is invalid because Defendants abused their very limited discretion by not proceeding in the manner required by law, issuing a decision unsupported by the findings, and issuing inaccurate findings that are unsupported by the evidence.

287.    Plaintiffs and the public each have beneficial interests that have been, and will further be, severely injured and adversely affected if the disapproval of the Project is not set aside and invalidated, and if Defendants' decision is allowed to stand.  Further Plaintiff Church has an interest in conducting services, meeting its religious goals, and providing community services to the public which are directly affected by the Defendants' improper denial of the Conditional Use Authorization which appears to be based upon discriminatory action by the Defendants which violate RLUIPA, the Free Exercise Clause of the UnitedStates Constitution, and the Fair Housing Act.

288.    "The Legislature's intent in enacting [the HAA] in 1982 and in expanding its provisions since then was to significantly increase the approval and construction of new housing for all economic segments of California's communities by meaningfully and effectively curbing the capability of local governments to deny, reduce the density for, or render infeasible housing development projects and emergency shelters. That intent has not been fulfilled."  (Gov't Code § 65589.5(a)(2)(K).)

289.    The HAA must be construed broadly and "consistent with, and in promotion of, the statewide goal of a sufficient supply of decent housing to meet the needs of all Californians." (Gov't Code § 65589(d).)

290.    The HAA requires, inter alia:

> When a proposed housing development project complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete, but the local agency proposes to disapprove the project or to impose a condition that the project be developed at a lower density, the local agency shall base its decision regarding the proposed housing development project upon written findings supported by a preponderance of the evidence on the record that both of the following conditions exist:
> (A) The housing development project would have a specific, adverse impact upon the public health or safety unless the project is disapproved or approved upon the condition that the project be developed at a lower density. As used in this paragraph, a "specific, adverse impact" means a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete.
>
> (B) There is no feasible method to satisfactorily mitigate or avoid the adverse impact identified pursuant to paragraph (1), other than the disapproval of the housing development project or the approval of the project upon the condition that it be developed at a lower density. (Gov. Code § 65589.5(j)(1).)

291.    The HAA provides that a housing development project shall be:

> deemed consistent, compliant, and in conformity with an applicable plan, program, policy, ordinance, standard, requirement, or other similar provision if there is substantial evidence that would allow a reasonable person to conclude that the housing development project. . . is consistent, compliant, or in conformity.

(Gov't Code § 65889.5(f)(4))

292.    The Project "complies with applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards," required to qualify for the requested land-use entitlements.

293.    Even if there were any ambiguity regarding the applicability of the HAA to the Project, the HAA directs that it must be construed broadly and "consistent with, and in promotion of, the statewide goal of a sufficient supply of decent housing to meet the needs of all Californians."  (Gov't Code § 65589(d).)  A broad interpretation of the HAA inexorably leads to the conclusion that it applies to the Project.

294.    Defendants have not proceeded in a manner required by law in denying Plaintiff's 316-unit code-compliant housing development Project without making findings that the Project would have a specific, adverse impact upon the public health or safety as required by section 65589.5(j).  In the context of the HAA, "specific, adverse impact" means "a significant, quantifiable, direct, and unavoidable impact, based on objective, identified written public health or safety standards, policies, or conditions as they existed on the date the application was deemed complete."

295.    The Board failed to make any such finding, much less one based on "objective, identified written public health or safety standards" or supported by a preponderance of the evidence.  Even if such a finding could be made, it would only justify denial of the Project if the Board were to find there is "no feasible method to satisfactorily mitigate or avoid the adverse impact . . . other than the disapproval of the housing development."  (Gov. Code § 65589.5(j)(1)(B).)  The Board made no such finding, and nor did the Board address this issue at all in its Findings.

296.    Defendants' disapproval is not based on the required findings and, to the degree Defendants attempted to make such findings, the findings are unsupported by evidence in the record.  Defendants disapproved the Project based solely on their subjective determination regarding what is "necessary, desirable, and compatible" with the neighborhood.  This is a

44

prohibited basis for the denial of a housing development project. The Defendants have exercised the approval and disapproval process in a discriminatory manner, with discriminatory effect and in violation of the Federal Acts and codes detailed above.

297.    Defendants bear the burden of proving that their actions complied with the HAA in all respects.  (Gov't Code § 65589.6.)  Defendants cannot satisfy this burden.

298.    Plaintiffs are informed and believe and thereon allege that the Defendants' arbitrary and disparate treatment of this group housing Project demonstrates unfair and irrationally discriminatory action, including because the City approved a similarly sized housing project at this site, where the principal difference is this Project provides group housing units rather than larger dwelling units.

299.    Plaintiffs assert that the disapprovals are invalid, for reasons in addition to the violation of the HAA, and Federal violations listed above, because Defendants abused their discretion by not proceeding in the manner required by law, including by requiring additional entitlements for the Project application subsequent to the 2018 project's approval, issuing a decision unsupported by the findings, and issuing findings that are unsupported by the evidence.

300.    San Francisco Planning Code § 303 establishes five criteria for a conditional use authorization and the Project meets all five criteria, as confirmed by the Planning Commission's findings in support of the Project, as well as by Defendants' approval of a similar project at the Project site in 2018. The San Francisco Planning Commission specifically found that "the Project is consistent and does comply with said criteria." Similarly, the Planning Commission found that "Section 304 establishes criteria and limitations for the authorization of Planned Unit Development (PUD)'s over and above those applicable to Conditional Uses," and the "Project is consistent with the relevant provisions of the Planning Code."

301.    Contrary to Defendants' disapproval, the Planning Code criteria for a conditional use authorization are met, and the Board abused its discretion in finding otherwise.  The Board's disapproval of the Project is based on speculative findings regarding the class of persons who reside in group housing projects and assumptions regarding the behavior and tendencies of that class of persons.  Defendants' illegal and discriminatory denial also violates the City's own codes.

302.    Defendants disregarded the findings and evidence necessary to support the disapproval and based the disapproval solely on the type of housing provided and the class of persons who reside in such housing, which is not a relevant criterion when considering whether to approve a conditional use authorization.

303.    Defendants acted in bad faith by denying a Code-compliant project on a clearly pretextual and prohibited basis. Defendants' demonstrated failure to follow their own objectives, time frames, and restrictions on the number of reviews as detailed in Exhibit A are indicative of their discriminatory intent to stymie low income housing when and where it is needed the most. The Church in seeking to provide a home for those in need, as well as the simultaneous exercise of religious freedom intend this writ of mandate cause of action to be the vehicle to ensure that the Federal and state code violations are ceased, and necessary housing and religious freedom be restored.

304.    Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law to challenge the disapproval, and a writ of mandate under Code of Civil Procedure § 1094.5 and/or § 1085 is the prescribed remedy for violations of this type.  Plaintiffs have performed all conditions precedent to the issuance of a writ of mandate. The decision was final and the Conditional Use Authorization was denied on December 14, 2021.   The Plaintiffs allege that the Court is empowered as "A writ of mandate may be issued by any court to any inferior tribunal, corporation,

board, or person, to compel the performance of an act which the law specifically enjoins, as a duty resulting from an office, trust, or station, or to compel the admission of a part to the use and enjoyment of a right or office to which the party is entitled, and from which the party is unlawfully precluded by that inferior tribunal, corporation, board or person." Cal. Code of Civil Procedure § 1085. Defendant's improper denial violates Federal and California State codes and thus are wrapped together and share a common nucleus supporting supplemental jurisdiction in this matter.

## COUNT VI

### Declaratory Relief - Violation of California Housing Accountability Act
### (Gov't Code § 65589.5 et. seq.)

305.    Paragraphs 1 through 304 are incorporated by reference as if set forth fully herein.

306.    An actual controversy has arisen and now exists between Plaintiffs and Defendants concerning their obligations and duties under California statutory law, including but not limited to Defendants' policies and practices which operate to avoid obligations established by state law, such as failing to approve a code-compliant housing development project without making any findings related to "objective, identified written public health or safety standards."

307.    As set forth herein, Plaintiffs contend that Defendants' actions to disapprove a code-compliant housing development project are prohibited by the state Housing Accountability Act (Gov. Code § 65589.5) and represent a pattern or practice of the City's review of housing development projects that has caused San Francisco to be amongst the top two most expensive housing markets in the United States.  Plaintiffs further contend that Defendants' actions are intended to evade their legal duties and deny Plaintiffs their rights under the Housing Accountability Act.

308.    Plaintiffs are informed and believe, and on that basis allege, that Defendants contend in all respects to the contrary.  A judicial determination and declaration as to the applicability of state law to Defendants' actions, and of the resulting legal obligations of Defendants, is therefore necessary and appropriate.

## COUNT VII

### Writ of Mandate – San Francisco Planning Code
### (Planning Code)

309.    Paragraphs 1 through 307 are incorporated by reference as if set forth fully herein.

310.    Plaintiffs assert that the disapprovals are invalid, regardless of whether the HAA is applicable to the Project, because Defendants abused their discretion by not proceeding in the manner required by law, including by requiring additional entitlements for the Project application subsequent to the 2018 project's approval, issuing a decision unsupported by the findings, and issuing findings that are unsupported by the evidence.

311.    Planning Code § 303 establishes five criteria for a conditional use authorization and the Project meets all five criteria, as confirmed by the Planning Commission's findings in support of the Project, as well as by Defendants' approval of a similar project at the Project site in 2018.

312.    Contrary to Defendants' disapproval, the Planning Code criteria for a conditional use authorization are met, and the Board abused its discretion in finding otherwise.  The Board's disapproval of the Project is based on speculative findings regarding the class of persons who reside in group housing projects and assumptions regarding the behavior and tendencies of that class of persons.  Defendants' speculative findings are unsupported by the evidence.

313.    Defendants' arbitrary and disparate treatment of this group-housing Project demonstrates unfair and irrationally discriminatory action, including because the City approved a

similarly sized housing project at this site in 2018, where the principal difference is that this Project provides group housing units rather than larger dwelling units.  Defendants' arbitrary and disparate treatment is an abuse of discretion.

314.    Defendants' disapproval is not based on the required findings or evidence in support of the findings.  Defendants disregarded the findings and evidence necessary to support the disapproval and based the disapproval solely on the type of housing provided and the class of persons who reside in such housing, which is not a relevant criterion when considering whether to approve a conditional use authorization.

315.    Plaintiffs have no plain, speedy, and adequate remedy in the ordinary course of law to challenge the disapproval, and a writ of mandate under Code of Civil Procedure § 1094.5 and/or § 1085 is the prescribed remedy for violations of this type.

## COUNT VIII

### Writ of Mandate – California Civil Code of Procedure
### (CCP § 1094.5)

316.    Paragraphs 1 through 315 are incorporated by reference as if set forth fully herein.

317.    Defendants' actions to allow new arguments and new evidence into the record after the public comment period had closed without allowing Plaintiffs an opportunity to respond denied Plaintiffs their right to a fair trial guaranteed under CCP § 1094.5.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief:

(a)    A declaration that Defendants' actions in delaying approval of the Project, and the Board's granting the appeal and denying the CUP, are illegal and unconstitutional

on the ground that they burden the Church's religious exercise without being the least restrictive means of fulfilling a compelling governmental interest, thereby violating the Free Exercise Clause of the First Amendment to the United States Constitution and the Religious Land Use and Institutionalized Persons Act of 2000;

(b)      A declaration that the Defendants' actions as alleged in the Complaint violate the Fair Housing Act, 42 U.S.C. § 3604;

(c)      A preliminary and permanent injunction overturning the Board's granting of the subject conditional use appeal; and preventing Defendants from illegally and unconstitutionally preventing the Plaintiffs from completing their Project, including, but not limited to, enjoining Defendants from applying the law in a manner that substantially burdens Plaintiffs' religious exercise and discriminates against racial minorities and families with children, and enjoining Defendants from preventing Plaintiffs' exercise of constitutional and statutory rights;

(d)      A writ of mandate or other appropriate relief, including an injunction, declaration, and/or order, commanding Respondents to comply with the Housing Accountability Act with respect to the proposed Project at 450 O'Farrell Street, including, but not limited to, an order that the Project is deemed compliant with all "applicable, objective general plan, zoning, and subdivision standards and criteria, including design review standards, in effect at the time that the application was deemed complete" as a matter of law;

(e)      An order overturning the Board's granting of the subject conditional use appeal (Board of Supervisors File No. 210858);

(f)      An order commanding Respondents to approve the subject Project pursuant to Gov.

50

Code § 65589.5(k)(1)(A)(ii);

(g)     An award to Plaintiffs of full damages, costs and attorney's fees arising from the Defendants' illegal and unconstitutional actions; including for reasonable attorney's fees under Code of Civil Procedure § 1021.5 and Gov. Code § 65589.5;

(h)     An award of monetary damages; and

(i)     Such other and further relief as this Court may deem just and appropriate.

## DEMAND FOR JURY

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs hereby demand a trial by jury in this action of all issues so triable.

Plaintiffs respectfully submitted this 14th day of March, 2022

DATED:  March 14, 2022                    COLLINS + COLLINS LLP

By:     DAVID A. ERICKSEN
        _____

        DAVID A. ERICKSEN
        JOSHUA A. COHEN
        Attorneys for Plaintiffs
        FIFTH CHURCH OF CHRIST, SCIENTIST,
        IN SAN FRANCISCO, CALIFORNIA,
        FORGE DEVELOPMENT PARTNERS,
        LLC, and TL 450, LLC